1   ELLORA THADANEY ISRANI (SBN 331877)
    eisrani@relmanlaw.com
2   VALERIE D. COMENENCIA ORTIZ (SBN 322379)
    vcomenenciaortiz@relmanlaw.com
3   LILA MILLER (SBN 310614)
    lmiller@relmanlaw.com
4   RELMAN COLFAX PLLC
    1225 19th St. NW, Suite 600
5   Washington, D.C. 20036
    Telephone:   (202) 728-1888
6   Facsimile:   (202) 728-0848

7   *Attorneys for Plaintiffs*

8
                    UNITED STATES DISTRICT COURT
9         FOR THE CENTRAL DISTRICT OF CALIFORNIA
                       SOUTHERN DIVISION
10

| | |
|---|---|
| 11   MARCKUS WILLIAMS, on behalf of himself and those similarly situated, and FAIR HOUSING CENTER OF CENTRAL INDIANA, | **Civil Action No: 8:24-cv-02534** |
| 13 | **CLASS ACTION COMPLAINT SEEKING NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES; JURY DEMAND** |
| Plaintiffs, | |
| 14   v. | |
| 15 | Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* |
| 16   TRICON RESIDENTIAL, INC., TRICON AMERICAN HOMES LLC, and TAH HOLDING LP, | |
| 17 | |
| Defendants. | |
| 18 | |

19

20

1

## NATURE OF THE ACTION

1. Plaintiffs Marckus Williams, on behalf of himself and those similarly situated, and the Fair Housing Center of Central Indiana ("FHCCI") bring this suit pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.*, and the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900 *et seq.*, for injunctive, monetary, and declarative relief against Defendants Tricon Residential, Inc., Tricon American Homes LLC, and TAH Holding LP (collectively, "Tricon" or "Defendants"), for engaging in a pattern or practice of illegal discrimination on the basis of race and gender in the marketing and rental of housing.

2. Tricon is one of the largest providers of single-family rental homes in the country. Tricon owns nearly 40,000 single-family rental homes in North America. Tricon markets, leases, and manages its single-family rental properties from its headquarters in Orange County, California.

3. At all its single-family rental homes nationwide, Tricon maintains two ongoing policies that have a disparate impact on the basis of race and/or gender. First, Tricon has a blanket ban against renting to individuals with a record of any felony convictions within the past seven years, or any convictions for a list of enumerated offenses regardless of when they occurred. Second, Tricon has a blanket ban against renting to individuals with a record of any eviction filings within at least the past two years.

4.      Tricon enforces these blanket bans by generating screening reports for every rental applicant to its homes nationwide. If the report shows any criminal and/or eviction filing history that Tricon has deemed disqualifying, the company immediately denies the applicant. The company does not inquire into whether the information on the screening report is correct; disregard convictions or evictions that have been expunged, sealed, or otherwise legally nullified; nor distinguish between eviction filings, most of which do not ultimately result in an eviction, and actual evictions. If the screening report shows *any* criminal or eviction filing history within the respective lookback periods, Tricon automatically rejects the applicant.

5.      This is precisely what happened to Plaintiff Marckus Williams. Mr. Williams, who is a Black man, applied to rent a Tricon home in Indianapolis, Indiana. His screening report showed three prior criminal convictions. Tricon applied its blanket ban and automatically denied Mr. Williams's application. Had Tricon inquired further, it would have learned that two of the listed convictions had been expunged—and one was not a conviction at all. Instead, Tricon immediately rejected Mr. Williams's application without any individualized consideration.

6.      Mr. Williams's struggle to find housing eventually brought him to FHCCI, a non-profit organization that promotes open access to housing, including through activities and programs that facilitate open housing access for those with

histories of incarceration and eviction. FHCCI counseled Mr. Williams on his rights and housing options.

7.      Tricon's continuing policy of refusing to rent to certain justice-involved[1] individuals harms FHCCI's programming. FHCCI undertook a comprehensive investigation into Tricon's practices and their discriminatory effects. FHCCI's investigation uncovered Tricon's categorical ban on renting not only to justice-involved individuals, but also to individuals with prior eviction filings. FHCCI's investigation further showed that these policies are in place at all Tricon single-family rental homes nationwide.

8.      Tricon's exclusionary criminal history policy has a racially disparate impact on Black[2] rental applicants. Nationally, and in the markets where Tricon is active, there are wide racial disparities at every step in the criminal legal process. Black people are more likely than white people to be stopped by law enforcement, arrested, convicted, and imprisoned at the federal, state, and local levels. Thus, Tricon's categorical criminal history policy has a significant, disproportionate, and predictable adverse impact—exclusion—on otherwise-qualified Black applicants.

---

[1] The term "justice-involved," as used throughout this Complaint, refers to individuals who have had prior contact with the criminal legal system via arrest, conviction, incarceration, or similar events.

[2] Throughout this complaint, "white" refers to non-Hispanic white, and "Black" refers to non-Hispanic Black individuals.

9.    Tricon's ongoing exclusionary eviction policy also has a disparate impact on Black applicants, and even more so on Black female[3] applicants. Nationally, and in the markets where Tricon is active, Black people, particularly Black women, disproportionately face eviction filings. Thus, Tricon's exclusionary eviction policy has a significant, disproportionate, and predictable adverse impact— exclusion—on otherwise-qualified Black and female applicants.

10.    There is an obvious and ready-made less discriminatory alternative for addressing any legitimate concerns Tricon may raise regarding the potential tenancy of applicants with criminal or eviction records: individualized review. Guidance issued by the U.S. Department of Housing and Urban Development (HUD) in 2016 and again in 2022 recommends individualized review as a less discriminatory alternative to categorically banning certain justice-involved applicants. Similarly, HUD guidance issued earlier this year states that eviction filing records are notably unreliable and should be reviewed on a case-by-case basis.

11.    Accordingly, Plaintiffs Marckus Williams and FHCCI both challenge Tricon's discriminatory criminal history policy under federal and state law. Because Mr. Williams is just one of hundreds, if not thousands, of individuals who have been

---

[3] This Complaint uses the terms "female" and "women" interchangeably throughout to refer to persons whose sex assigned at birth is female because criminal and eviction court records report sex assigned at birth as opposed to self-identified gender identity.

discriminated against by Tricon's policy of not renting to certain justice-involved applicants, he brings his claims on behalf of all Black applicants who were otherwise qualified to rent with Tricon but were automatically rejected from tenancy based on Tricon's criminal history policy. Furthermore, Plaintiff FHCCI challenges Tricon's discriminatory eviction filing policy under federal and state law.

12.     Plaintiffs seek to prevent Tricon from continuing its discriminatory and unlawful conduct; ensure that applicants injured by Tricon's practices will have a meaningful opportunity to secure desperately needed rental housing; and redress the harm suffered as a direct result of Tricon's conduct.

## **PARTIES**

13.     Plaintiff Marckus Williams resides in Indianapolis, Indiana. He brings this case on behalf of himself and a class of similarly situated individuals.

14.     Plaintiff FHCCI is a not-for-profit corporation headquartered in Indianapolis, Indiana. FHCCI is dedicated to promoting safe, affordable, and accessible housing for all individuals. Its programs and activities in furtherance of this mission include providing counseling and referrals to individual housing consumers and housing providers, neighborhood stabilization and community investment, and supporting legislation that will promote open access to housing.

15.     Defendants Tricon Residential, Inc., Tricon American Homes LLC, and TAH Holding LP together do business as Tricon Residential and manage the application screening process of Tricon's rental home portfolio.

16.     Defendant Tricon Residential, Inc. is incorporated in Delaware with its principal U.S. place of business in Tustin, California. Tricon Residential, Inc. was founded in 1988. By and through its subsidiaries, Tricon Residential owns, leases, and manages tens of thousands of single-family rental homes across the United States.

17.     Defendant Tricon American Homes LLC is a limited liability corporation incorporated in Delaware with its principal place of business in Tustin, California. Tricon American Homes LLC was formed on June 15, 2012. Tricon American Homes is a subsidiary of Tricon Residential. Tricon American Homes, by and through its subsidiaries, serves as the property manager for Tricon's single-family rental homes in the United States.

18.     Defendant TAH Holding LP is a limited partnership formed in Delaware with its principal place of business in Tustin, California. TAH Holding LP is a subsidiary of Tricon Residential. TAH Holding LP was formed on July 1, 2014. TAH Holding LP owns single-family homes across the United States that Tricon American Homes LLC, by and through its subsidiaries, rents out and manages on TAH Holding LP's behalf.

19.     In acting or omitting to act as alleged herein, Defendants were acting

through their employees, officers, directors, agents, successors, assignees, affiliates,

predecessors, parents or controlling entities, and/or subsidiaries and are liable on the

basis of the acts and omissions thereof.

20.     In acting or omitting to act as alleged herein, each employee or officer

of Tricon was acting in the course and scope of their actual or apparent authority

pursuant to such agencies, or the alleged acts or omissions of each employee or

officer as a Tricon agent were subsequently ratified and adopted by Tricon as

principal.

21.     Each Defendant participated in the acts and/or omissions at issue, acted

in concert with, or acted as an agent or servant of other Defendants.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. §

3613. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because

the claims alleged herein arise under the laws of the United States. This Court has

supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §

1367.

23.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because

Defendants reside in this district. Venue is also proper under 28 U.S. § 1391(b)(2)

because the events or omissions giving rise to Plaintiffs' claims took place in Tustin, California.

## FACTUAL BACKGROUND

### I.    Tricon Owns and Manages Tens of Thousands of Single-Family Rental Homes in Cities Around the Country

24.    Tricon was founded in 1988 as a fund manager for residential real estate investors. In 2012, Tricon entered the U.S. single-family home rental business. Tricon purchased homes that were being foreclosed upon in the aftermath of the Great Recession and began renting them out. It has become one of the largest single-family homeowners and corporate landlords in the U.S. market.

25.    Tricon owns and operates a portfolio of approximately 40,000 single-family homes across North America, with a growing focus on the U.S. Sun Belt.

26.    Tricon targets "middle-market" renters with household incomes from $75,000 to $125,000 per year, whom they expect to seek home rental rates of $1,600 to $2,300 per month. As of December 31, 2023, the average rent for a single-family Tricon home was $1,877.

27.    Tricon Residential, Inc. manages its single-family rental homes through a series of subsidiaries, including Tricon American Homes LLC and TAH Holding LP. These subsidiaries function as one with respect to property management and implementation of the challenged policies.

28.    TAH Holding LP owns Tricon's single-family U.S. rental homes. Tricon American Homes LLC, by and through state-specific members/subsidiaries, acts as a property manager for all U.S. single-family rental homes owned by TAH Holding LP on behalf of Tricon Residential, Inc. In this role, Tricon American Homes LLC sets policies regarding applicant requirements and qualifications—such as the policies at issue in this case—that apply to all TAH Holding LP-owned homes.

29.    In 2015, Tricon internalized its single-family rental home property management. Tricon provides integrated property management services to its entire rental portfolio. The property management business is headquartered in Orange County, California, and provides resident-facing services such as marketing, leasing, repairs, and maintenance delivered through a dedicated call center.

30.    Tricon Residential, Inc.'s Chief Resident Experience Officer, who is also the President of Operations for Tricon American Homes LLC, works out of Orange County, California. The majority of Tricon's U.S.-based executives work out of Orange County.

31.    Earlier this year, the private equity firm Blackstone took Tricon private. Blackstone is now Tricon's parent company. In July 2024, Blackstone announced that Tricon would take over property management for additional single-family rental homes in Blackstone's portfolio, making Tricon Blackstone's only single-family rental management company.

32.     Focusing on single-family rentals has been hugely profitable for Tricon. Tricon reported $795.3 million in revenue from single-family rental properties alone in 2023, an increase of 23.2% over 2022.

## II.     Tricon Automatically Rejects Certain Rental Applicants Based on Justice Involvement, Which Constitutes Unlawful Discrimination

### A.     Tricon Automatically Rejects Applicants with Any Felony Conviction Within the Past Seven Years, or Certain Types of Convictions Regardless of When They Occurred

33.     When a person applies to a Tricon property, Tricon screens the applicant using a report from a third-party screening provider. Each applicant must pay a nonrefundable $55 screening fee for the generation of this report.

34.     The screening report contains information about the applicant's prior rental history, credit report, and other similar information. The report also contains a renter "score" and a recommendation about whether Tricon should rent to the applicant.

35.     Tricon rejects all applicants whose screening report shows any felony convictions within the past seven years, or any convictions for arson, crimes against children, homicide, kidnapping, or sex crimes (hereinafter, "the enumerated

convictions"), regardless of when the offense occurred.[4] Tricon automatically and categorically rejects such applicants, without any additional review of their applications. Tricon representatives have confirmed that this policy applies at all Tricon rental homes nationwide, and it is reflected in Tricon's public articulation of applicant qualifications.

36.    For these justice-involved applicants, Tricon does not consider any mitigating information, such as whether the applicant has a stable rental and/or employment history, their age at the time of the offense, character references, or evidence of changed circumstances.

37.    Nor does Tricon differentiate based on type of felony conviction, how long ago the conviction was (within the seven-year lookback period), or whether the conviction has been expunged, sealed, or otherwise legally nullified.

38.    Tricon does not tell people who are denied based on a conviction appearing on their screening report that this was the reason for the denial. To find out the reason for the denial, rejected applicants must contact Tricon's call center.

39.    Tricon has no appeals process by which an individual who is rejected based on apparent prior justice-involvement can challenge the accuracy of their

---

[4] Tricon may also automatically disqualify applicants whose screening report shows certain misdemeanor convictions.

screening report, present mitigating information, or otherwise receive an individualized review.

**B.    Mr. Williams Was Adversely Affected by Tricon's Discriminatory Policy**

40.    Mr. Williams lives in Indianapolis with his wife and baby. More than a decade ago, he spent time in prison for drug possession offenses. Since his release, he has worked hard to become a community leader. For example, Mr. Williams founded a grocery store in a former "food desert" in Indianapolis.[5]

41.    On November 28, 2022, Mr. Williams and his then-fiancée applied to rent a Tricon home at 2613 Harshaw Court, Indianapolis, IN. They paid all application fees, including the screening fee, and were financially qualified for the property. Mr. Williams received an email from Tricon that day confirming that his application had been received.

42.    On or about November 28, 2022, Tricon ran a background check on Mr. Williams and generated a screening report.

43.    On November 29, 2022 at 10:02 AM, Mr. Williams received an email from Tricon American Homes (admin@triconah.com) stating that the company was

---

[5] "Food deserts" are "neighborhoods and communities that have limited access to affordable and nutritious foods." Nat'l Rsch. Council, *The Public Health Effects of Food Deserts: Workshop Summary* 1 (2009), https://www.ncbi.nlm.nih.gov/books/NBK208016/ [https://perma.cc/GZF8-64RK].

"unable to accept your rental application at this time" "based in whole or in part on the information provided" by a screening report. However, the email stated that the third-party screening company "plays no part in the decision to take any action on your rental application and is unable to provide you with specific reason(s) for not accepting your application."

44.     At the same time, Mr. Williams and his then-fiancée both received an email from Tricon Residential (mtorres@triconresidential.com) stating that "a disqualifying record" was found in "the credit/background screening," and instructing them to contact the screening company if they wanted "the full breakdown of your report." The email further stated:

> "Tricon is part of a large corporation. We have strict policies and criteria which must be followed and met – no exceptions."

45.     On or about November 29, 2022, Mr. Williams called Tricon to inquire further about the denial. A Tricon representative informed him that he had been rejected due to the "Criminal History" section of his screening report. Mr. Williams informed the representative that his prior criminal convictions had been expunged. Upon learning about the expungements, the Tricon representative encouraged Mr. Williams to re-apply to Tricon.

46.    Accordingly, Mr. Williams and his then-fiancée reapplied for the Tricon home at 2613 Harshaw Court on November 30, 2022. They again paid the application/screening fees.

47.    That same evening at 7:02 PM, they received another email from a Tricon American Homes address informing them that their second application had been rejected "based in whole or in part on the information provided" in a screening report.

48.    They simultaneously received another email from a Tricon Residential address informing them that "the application was denied due to a disqualifying record found reported active as to your file." The email reiterated that "no exceptions" would be made to Tricon's "strict policies and criteria."

49.    The following day, December 1, 2022, Mr. Williams's then-fiancée responded to Tricon Residential, requesting a copy of the disqualifying report as well as "a written copy of Tricon's policy regarding criminal convictions and their impact on housing decisions." A Tricon Residential representative responded and instructed them to contact the screening company.

50.    They did so and received Mr. Williams's report on December 1, 2022. The report gave Mr. Williams a renter "score" of 494 with the recommendation "Accept with Conditions." The report explained:

"Your management company established criteria (decision points) appropriate

for approval of applicants to your community. Questions regarding these

criteria should be directed to your management company."

51.    The report stated that Mr. Williams had three prior criminal

convictions: a guilty plea for three counts of possession of a controlled substance on

September 10, 2012; a "plea by agreement" for a single count of possession of a

controlled substance on January 27, 2017; and a conviction for a single count of

possession of cocaine or narcotics on April 20, 2006.

52.    Had Tricon conducted an individualized review, it would have learned

that the first and third of these convictions, for conduct in 2012 and 2006

respectively, had been expunged from Mr. Williams's record prior to the generation

of his screening report. The second "conviction," from 2017, was in fact not a record

of a criminal offense at all. Rather, it was a record of Mr. Williams's participation

in a court-ordered program after a period of incarceration, to help him reenter the

community and make positive life changes.

53.    When Mr. Williams informed Tricon representatives on the phone that

these convictions had been expunged or incorrectly reported, Tricon did not conduct

an individualized review of his application or otherwise reconsider whether his

justice-involvement should be disqualifying as to his rental application. Rather, they

informed Mr. Williams that Tricon had a "no exceptions" policy.

54.    On or around December 1, 2022, Mr. Williams's then-fiancée communicated by phone with several Tricon representatives. When discussing their rejected application, a Tricon representative told Mr. Williams's then-fiancée to find a "better roommate" than Mr. Williams, apparently referring to Mr. Williams's prior convictions.

55.    Mr. Williams subsequently worked to get this inaccurate information removed from his record and to get the 2017 "conviction" expunged. In so doing, he met Plaintiff FHCCI.

**C.    FHCCI's Investigation Revealed Tricon's Policy Against Renting to Certain Justice-Involved Individuals Is Robust and Nationwide**

56.    Given the potential implications of Tricon's ongoing policy on FHCCI's efforts to promote safe, affordable, and accessible housing, in light of Mr. Williams's experience, FHCCI was compelled to investigate Tricon's policy further. FHCCI's investigation included telephonic investigative calls and online research, both conducted by trained employees following standardized protocols, including making a contemporaneous record of their findings.

57.    In November 2023, an FHCCI staff member called Tricon's general customer service number to inquire about its policy on applicants with criminal justice involvement. A Tricon representative informed the FHCCI caller that any felony convictions in the past seven years would result in an automatic denial. The

1    agent further stated that any convictions for arson, crimes against children, homicide,

2    kidnapping, or sex crimes, regardless of when the convictions occurred, would result

3    in an automatic denial.

4        58.    The FHCCI caller specifically asked whether a felony drug possession

5    conviction from five years ago, that had since been expunged, would disqualify them

6    from renting a Tricon home. The Tricon agent responded that, if the conviction

7    showed up on a screening report—regardless of whether it had been expunged—it

8    would be disqualifying. The FHCCI caller did not state which Tricon property they

9    sought to apply to, and the agent did not ask.

10        59.    Both Mr. Williams and FHCCI separately filed complaints against

11    Tricon with the U.S. Department of Housing & Urban Development (HUD)

12    regarding Tricon's refusal to rent to certain justice-involved individuals on

13    November 29, 2023.

14        60.    FHCCI continued its investigation. On May 8, 2024, another FHCCI

15    staff member called Tricon about a single-family rental in Southern California. The

16    caller stated that his brother had a felony conviction for theft from six years ago and

17    asked if his brother would be able to rent at the property. The Tricon agent responded

18    that the brother's conviction would result in an automatic denial. The caller asked if

19    his brother would be able to rent at a different Tricon property. The Tricon agent

20

responded that Tricon's ban on renting to certain justice-involved applicants applies at all of its rental properties.

61.    On May 22, 2024, another FHCCI staff member called Tricon to ask if a felony conviction from nine years ago would disqualify them from renting a Tricon home in Southern California. The Tricon agent responded that any felony conviction within seven years would result in an automatic denial, and a conviction from nine years ago would be evaluated on a case-by-case basis.

62.    On May 23, 2024, another FHCCI staff member called Tricon to ask if a felony drug possession conviction from six years ago would disqualify them from Tricon housing. The Tricon agent responded that felonies can be disqualifying if they appear on the screening report. The FHCCI caller asked if this policy applies across all Tricon properties. The Tricon agent responded that it does.

63.    Through these investigative calls, FHCCI confirmed that the company's categorical ban on renting to certain justice-involved applicants is broadly applied at Tricon's thousands of properties across the country.

64.    FHCCI also surveyed Tricon tenants in December 2023, January 2024, and May 2024 by mail and phone. These surveys included a tenant screening section that inquired about the tenant's experiences with Tricon's application process, background checks, and denials (if any). Through the surveys, FHCCI confirmed Tricon's policy against renting to certain justice-involved applicants.

**D.    Tricon's Justice-Involvement Policy Illegally Discriminates Against Black Individuals**

    **i.    Tricon's Blanket Ban Disproportionately and Severely Impacts Black Individuals**

65.    Racial disparities in the criminal justice system are well-established, persistent, and widely known. Black individuals are incarcerated at rates significantly disproportionate to their numbers in the United States general population. As of 2022, at the national level, the overall rate of incarceration of Black adults was 5.22 times that of white adults.[6]

66.    These disparities persist among people released from incarceration. Nationally, almost half a million people are released from confinement each year.[7] Largely because the imprisoned population is disproportionately Black and 95% of the imprisoned population is eventually released,[8] 35% of the formerly incarcerated population—but only 12% of the overall population—in the United States is Black.[9]

---

[6] See E. Ann Carson & R. Kluckow, U.S. Dep't of Just., *Prisoners in 2022 – Statistical Tables*, Bureau of Just. Stats. 13 (Nov. 2023), https://bjs.ojp.gov/document/p22st.pdf [https://perma.cc/LDM6-4R5T].

[7] *Id.* at 19 (providing statistics for releases in 2021 and 2022).

[8] Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. of Sociology 937, 938 (2003).

[9] Terry-Ann Craigie et al., *Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality*, The Brennan Ctr. for Just. 10 fig. 1 (2020), https://www.brennancenter.org/our-work/research-reports/conviction-imprisonment-and-lost-earnings-how-involvement-criminal [https://perma.cc/4ZMT-5YNH].

67.    On the other hand, white people are incarcerated and released from jails and prisons at rates significantly lower than their representation in the general population at the national and state levels.

68.    As is generally the case with blanket bans, due to the wide and persistent racial disparities described above, Tricon's blanket ban has a clear disparate impact on the basis of race. Black individuals are far more likely than white individuals to have a criminal record. As a result, Tricon's blanket ban operates to disqualify otherwise-qualified Black individuals from living in its properties at disproportionate rates.

69.    The likely impact of an exclusionary policy like Tricon's can be estimated using data from the United States Census Bureau, the Bureau of Justice Statistics, and the Criminal Justice Administrative Records system.

70.    Presently available data indicate that nationally, the proportion of Black renters disqualified by Tricon's blanket ban on renting to people with any felony convictions within the past seven years is 5.32 times greater than the proportion of white renters disqualified. In other words, the proportion of disqualified Black renters is 532% larger than the proportion of disqualified white renters.

71.    Black people are also overrepresented in the prison populations in the ten states where Tricon operates single-family rental homes: Arizona, California, Florida, Georgia, Indiana, Nevada, North Carolina, South Carolina, Tennessee, and

Texas. For example, data from 2021 shows that Black people comprised just 5% of California's general population but comprised 28% of California's prison population. Similarly, Black people comprised just 9% of Indiana's general population but comprised 31% of Indiana's prison population. These 2021 numbers for every state where Tricon has homes are as follows:



72.    Similarly, in Marion County, Indiana, where Plaintiffs reside, between March 2023 and March 2024, the proportion of Black renters with a felony conviction was 1.63 times greater than the proportion of white renters with a felony conviction. That is, the proportion of Black renters disqualified by Tricon's blanket ban is 163% larger than the proportion of disqualified white renters.

73.    All of these numbers likely understate the racially disparate impact of Tricon's policy because the company excludes not only persons with any felony

convictions within the past seven years but also persons with certain enumerated convictions regardless of when they occurred.

74.    The disproportionate adverse impact of Tricon's blanket exclusion of justice-involved individuals on Black prospective tenants is clear from these findings. The ongoing policy prevents prospective Black tenants—both those who apply and are rejected, and the untold number of potential Black applicants who did not even bother to apply to Tricon because of its publicly articulated policy against renting to justice-involved persons—from living in the housing of their choice more often than it does prospective white tenants.

### ii.    Giving Individualized Consideration to Applicants' Circumstances Is a Less Discriminatory Alternative That Would Satisfy Any Concerns

75.    Tricon's blanket ban on renting to certain justice-involved applicants is not necessary to achieve any legitimate nondiscriminatory business purpose. While Tricon may argue that excluding justice-involved renters is justified by public safety concerns, a blanket ban is not necessary to satisfy that concern. Providing individualized consideration of each applicant's circumstances, including any prior justice-involvement, is a less discriminatory alternative that would serve public safety equally well.

76.    Nor can Tricon rely on any concerns related to negative housing outcomes, such as failure to pay rent or lease terminations. In fact, a 2019 study found that most criminal offenses have no significant effect on housing outcomes.[10] To the extent that a prior criminal offense may increase the likelihood of any negative housing outcomes, any such effect declines over time and becomes insignificant two years after a misdemeanor, and five years after a felony. A categorical ban that fails to account for the nature of the conviction, as well as other relevant factors, and/or applies an unreasonable lookback period, is therefore unnecessary to address any such concerns.

77.    Tricon may protect public safety and prevent negative housing outcomes by employing an individual assessment that considers the nature of an individual's conviction, age at the time of the conduct, the amount of time since the conviction, and evidence of changed circumstances, among other factors. Such an individualized assessment allows justice-involved individuals who pose no realistic current or future threat to the community to obtain housing. This more targeted and narrower approach both protects public safety and is less discriminatory and

---

[10] *See* Cael Warren, *Success in Housing: How Much Does Criminal Background Matter?*, Wilder Rsch. 23 (Jan. 2019), https://www.wilder.org/sites/default/files/imports/AEON_HousingSuccess_CriminalBackground _Report_1-19.pdf [https://perma.cc/X9Q9-9JXQ] ("Most types of criminal offenses do not significantly increase a household's likelihood of a negative housing outcome when other observable factors are held constant.").

exclusionary because it reduces the number of Black applicants who would be banned from Tricon properties.

78.    This is precisely the framework that HUD has recommended that housing providers use in assessing potential applicants.

79.    In 2016, HUD issued guidance on the use of criminal records in housing transactions, recognizing that "[b]ecause of widespread racial and ethnic disparities in the U.S. criminal justice system, criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics."[11] It specifically warned that "[a] housing provider that imposes a blanket prohibition on any person with any conviction record—no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then—will be unable to meet [their] burden" to show that such a policy is necessary to achieve a substantial, legitimate, nondiscriminatory interest precisely because an individualized assessment that accounts for relevant mitigating information, such as the circumstances surrounding the criminal conduct, the age of the individual at the

---

[11] U.S. Dep't of Hous. & Urb. Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* 10 (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF [https://perma.cc/6EPM-2JBD].

1    time of the conduct, their history as a tenant, and evidence of changed circumstances,

2    is an obvious less discriminatory alternative to categorical exclusions.[12]

3        80.    Major industry organizations including the National Multifamily

4    Housing Council, the National Apartment Association, and the National Association

5    of Realtors all disseminated information about the HUD Guidance and emphasized

6    the importance of dispensing with automatic criminal history bans.[13] It is very

7    unusual for apartment companies to thoroughly disregard sound and well-known

8    industry practices designed to prevent discrimination. Upon information and belief,

9    Defendants have been aware of the HUD Guidance since its release.

10        81.    In a June 2022 Memorandum, HUD reaffirmed those principles and

11    provided additional guidance and recommendations to facilitate implementation of

12    the 2016 Guidance.[14] The June 2022 Memorandum recognized that housing

---

13

14    [12] *Id.* at 6.

15    [13] Nat'l Multifamily Hous. Council, *Tips for Better Criminal Activity Screening* (Nov. 22, 2016),
     https://www.nmhc.org/news/articles/tips-for-better-criminal-activity-screening/
16    [https://perma.cc/3MB7-HLL8]; Nat'l Apartment Ass'n, Fed Officials Warn Against Blanket
     Criminal History Exclusions (Apr. 25, 2016), https://www.naahq.org/fed-officials-warn-against-
     blanket-criminal-history-exclusions [https://perma.cc/UAB7-DJGQ]; Nat'l Ass'n of Realtors,
17    *What the Latest Fair Housing Guidance on Criminal Background Checks Means for Real Estate*
     (May 13, 2016), https://www.prnewswire.com/news-releases/what-the-latest-fair-housing-
     guidance-on-criminal-background-checks-means-for-real-estate-300268465.html
18    [https://perma.cc/LF22-V6HQ].
     [14] *See generally* U.S. Dep't of Hous. & Urb. Dev., Memorandum on Implementation of the
19    Office of General Counsel's Guidance on Application of Fair Housing Act Standards to the Use
     of Criminal Records by Providers of Housing and Real-Estate Transactions (June 10, 2022),
20    https://www.hud.gov/sites/dfiles/FHEO/documents/Implementation%20of%20OGC%20Guidanc
     e%20on%20Application%20of%20FHA%20Standards%20to%20the%20Use%20of%20Crimina
     l%20Records%20-%20June%2010%202022.pdf [https://perma.cc/US5G-VBLB].

providers' "written and unwritten policies and practices" concerning background screening may create an unjustified discriminatory effect in violation of the FHA, and reaffirmed that individualized assessment of relevant mitigating information from applicants with criminal justice involvement is likely to have a less discriminatory effect than categorical exclusions like Tricon's.

### III. Tricon Automatically Rejects Certain Rental Applicants Based on Prior Eviction Filings, Which Constitutes Unlawful Discrimination

#### A. Tricon Automatically Rejects Certain Applicants with Eviction Filings, Regardless of Whether the Eviction Was Ultimately Completed

82. In addition to its work making housing available to justice-involved individuals, FHCCI also works to increase access to housing for individuals with a record of prior evictions.

83. For example, FHCCI was part of a coalition that successfully lobbied the Indiana legislature in 2022 to create a mechanism by which renters in Indiana can have eviction filings that were dismissed, resolved by a court in their favor, or overturned on appeal expunged from their records. FHCCI now assists renters with eviction expungement, in addition to providing other forms of housing counseling to clients with eviction histories.

84.    As such, in the course of investigating Tricon's ongoing policy against renting to certain justice-involved individuals, FHCCI also inquired about Tricon's policies regarding renting to persons with eviction filings on their screening report.

85.    FHCCI learned that Tricon automatically rejects applicants whose screening reports show an eviction filing within at least the past two years, and perhaps even further back in time.

86.    This ban applies equally to eviction filings that were ultimately dismissed, sealed, or expunged; any eviction filing that shows up on the report is disqualifying, regardless of outcome.

87.    Furthermore, because Tricon automatically rejects based on eviction *filings*, not merely completed evictions, Tricon automatically rejects applicants whose screening report shows evictions that were ultimately dismissed, decided in the renter's favor, or overturned on appeal—the very eviction filings that FHCCI worked to make expungable.

88.    Just as they do with criminal convictions, Tricon relies on a screening report to determine whether an applicant has an eviction filing within at least the past two years. If the report shows such an eviction filing, Tricon automatically rejects the applicant.

89.    Tricon does not conduct an individualized review or consider mitigating information, such as whether the eviction was actually completed (as

opposed to merely filed), whether the applicant has had a stable rental history since the eviction, whether any completed eviction was subsequently expunged/sealed, what circumstances led to the eviction filing, or whether the applicant's financial status has changed.

90. Applicants who are rejected due to an eviction filing on the screening report are given no opportunity to challenge the accuracy of the report or provide contextual information to Tricon.

91. On information and belief, this ongoing policy against renting to people with any eviction filing within the past two years applies to all of Tricon's single-family rental homes nationwide.

**B.     FHCCI's Investigation Revealed Tricon's Policy Against Renting to Certain Individuals with Prior Eviction Filings Is Robust and Nationwide**

92. Trained FHCCI employees conducted investigative calls regarding Tricon's continuing policy against renting to persons with prior eviction filings. The investigations follow standardized protocols, including making a contemporaneous record of their findings.

93. During a November 6, 2023 call by an FHCCI staff member to Tricon's customer service line, a Tricon agent informed the FHCCI staff member that Tricon automatically denies applicants whose screening reports show prior eviction filings.

The FHCCI staff member asked if this blanket ban applies only to individuals with completed evictions, or also to those with mere filings. The Tricon agent responded that the company does not differentiate between eviction filings and completed evictions; both are grounds for automatic rejection. On this call, the FHCCI staff member did not inquire about any specific Tricon property, and the Tricon agent did not ask whether their questions pertained to a specific property.

94.    On May 22, 2024, another FHCCI staff member called Tricon to inquire about Tricon's no-prior-eviction-filings policy for a Tricon home in Southern California. A Tricon agent informed them that any eviction within the past few years that shows up on the screening report is grounds for automatic disqualification. The FHCCI staff member asked if an eviction filing that was subsequently dismissed would be grounds for rejection. The Tricon agent responded that the company relies on what shows up in the screening report. If an eviction filing within the last few years appears on the report, Tricon automatically rejects the applicant.

95.    On May 29, 2024, another FHCCI staff member called Tricon and asked whether an eviction from two years ago that was dismissed would be disqualifying for a Tricon home in Southern California. A Tricon agent responded that if the eviction did not show up on the applicant's screening report, they should be fine, but in the inverse, if the dismissed eviction did show up on the report, it would be disqualifying.

96.     The phone and mail surveys that FHCCI conducted in December 2023, January 2024, and May 2024 confirmed Tricon's continuing policy against renting to certain persons with prior eviction filings.

**C.     Blanket Bans on Renting to Individuals with Eviction Filings Disproportionately and Severely Impact Black Renters, Particularly Black Women**

**i.     Tricon's Blanket Ban Disproportionately and Severely Impacts Black Individuals, Especially Black Women**

97.     Racial and gender disparities in eviction filings are well-established, persistent, and widely known. Black renters, especially Black women, are more likely to be subjected to eviction filings than any other racial or gender group.

98.     Less than one-fifth of American renters are Black (18.6%), but over half of all eviction filings are against Black renters (51.1%). By contrast, although over half of American renters are white (50.5%), only 26.3% of eviction filings are against white renters.[15]

99.     The disparities are even worse for Black female renters. Black female renters without children are threatened with eviction at an annual rate of 16.3%,

---

[15] Nick Graetz et al., *A Comprehensive Demographic Profile of the US Evicted Population*, 120 Proc. Nat'l Acad. Scis. U.S. 1, 3 (2023) https://www.pnas.org/doi/10.1073/pnas.2305860120#sec-2.

whereas white female renters without children are threatened with eviction at an annual rate of 2.4%. That is, Black female renters without children are threatened with eviction at about 6.8 times the rate at which white female renters without children are threatened with eviction. Disparities persist for Black women with children, who are threatened with eviction at about 4.3 times the rate of white female renters with children (28.3% v. 6.6%).[16]

100.   A recent report by the Consumer Financial Protection Bureau (CFPB) noted the disparate impact of eviction filings on Black renters, particularly women, who are disproportionately subject to and affected by eviction filings—even after controlling for failure to pay rent.[17]

101.   As is generally the case with blanket bans, due to the wide and persistent racial disparities described above, Tricon's blanket ban has a clear disparate impact on the basis of race and gender. Black renters, particularly Black women, are far more likely than white individuals to have a history of eviction filings. As a result, Tricon's blanket ban operates to disqualify otherwise-qualified Black renters, especially Black women, from living in its properties at disproportionate rates.

---

[16] *Id.*

[17] Consumer Fin. Prot. Bureau, Tenant Background Checks Market 33–34 (Nov. 2022), https://files.consumerfinance.gov/f/documents/cfpb_tenant-background-checks-market_report_2022-11.pdf [https://perma.cc/U5ZF-SCUG].

102.   The likely impact of an exclusionary policy like Tricon's can be estimated using data from the United States Census Bureau, the Bureau of Justice Statistics, and the Criminal Justice Administrative Records system.

103.   Presently available data indicate that nationally, the proportion of Black renters disqualified by Tricon's blanket ban on renting to people with eviction filings is 0.94 times greater the proportion of white renters disqualified. In other words, Black rental applicants are nearly twice as likely to be disqualified as white rental applicants by Tricon's blanket ban.

104.   The proportion of Black female renters disqualified by Tricon's blanket ban nationwide is twice the proportion of white female renterss.

105.   The areas in which Tricon owns and rents single-family homes have racial disparities in eviction filings that mirror national trends. For example, Marion County, Indiana has approximately 258,000 adult renters. Approximately 39% are Black, and 42% are white. Yet the proportion of Black renters disqualified from Tricon's properties based on its policy against renting to individuals with eviction filings is 110% larger than the proportion of white renters disqualified by the policy. Put differently, while the number of white and Black renters in Marion County is approximately equal, more than twice as many Black renters are disqualified by Tricon's blanket ban on renting to persons with a history of eviction filings.

106.   The disproportionate adverse impact of Tricon's blanket exclusion of individuals with eviction filings on Black prospective tenants, especially Black women, is clear from these findings. The ongoing policy prevents Black tenants, particularly Black female tenants, from living in the housing of their choice more often than it does white tenants.

> **ii.   Giving Individualized Consideration to Applicants' Circumstances Is a Less Discriminatory Alternative That Would Satisfy Any Concerns**

107.   Tricon's blanket ban is not necessary to achieve any legitimate nondiscriminatory business purpose. While Tricon may argue that categorically excluding persons with eviction filings is justified by concerns about negative housing outcomes, blanket bans are not necessary to satisfy that concern. Rather, providing individualized consideration to each applicant's circumstances is a less discriminatory alternative that would mitigate any concerns about housing outcomes without automatically excluding many Black people and Black women.

108.   An eviction filing is not necessarily probative of an eviction outcome because many eviction filings are later defeated by the tenant, settled, or voluntarily dismissed.

109.    Eviction filing records are "notably unreliable."[18] The recent CFPB report cited a study of 3.6 million eviction court records which found that, on average, 22% of state eviction records are false or ambiguous.[19] The CFPB report also explained that third-party screening companies—such as the company that generates reports for Tricon—often "lack adequate procedures" to address the "complexities and errors" in eviction data.[20]

110.    Eviction filings can be more probative as to the landlord than the tenant. For example, one study found that "large landlords"—those who own 55 units on average, do not reside with tenants, and are often large corporations—are 186% more likely to file for eviction than "small landlords," who own only a handful of units and live in the same building as their tenants about one-quarter of the time.[21] And filings by large landlords were 68% less likely than filings by small landlords to result in a completed eviction.[22]

---

[18] Off. of Fair Hous. & Equal Opportunity, U.S. Dep't Hous. & Urb. Dev., *Guidance on Application of the Fair Housing Act to the Screening of Applicants for Rental Housing* 19 (Apr. 29, 2024), https://www.hud.gov/sites/dfiles/FHEO/documents/FHEO_Guidance_on_Screening_of_Applicants_for_Rental_Housing.pdf [https://perma.cc/NSW9-J8MA].

[19] CFPB, *supra* n.17, at 2.

[20] *Id.* at 32.

[21] *Research Summary: Do Large Landlords' Eviction Practices Differ From Small Landlords'?*, Hous. Matters (Feb. 1, 2023), https://housingmatters.urban.org/research-summary/do-large-landlords-eviction-practices-differ-small-landlords#:~:text=Large%20landlords%20filed%20evictions%20186,but%20by%20the%20ownership%20structure [https://perma.cc/BMJ4-DE2U].

[22] *Id.*

111.   Landlords often commence eviction filings against their renters for reasons that are not the fault of the renter, known as "no-fault evictions"—for example, in order to sell the property, do construction, or re-occupy the unit themselves.

112.   Tricon may prevent negative housing outcomes by instead employing an individualized assessment that considers the nature of the prior eviction; whether it was completed or merely filed; whether it has been expunged; whether it was a "no-fault" eviction; and whether the renter's circumstances have changed since the prior eviction, among other factors. Such an individualized assessment allows individuals with prior eviction filings that are not probative of their ability to be a successful renter to obtain housing. This targeted and narrower approach both protects any legitimate concerns about negative housing outcomes and is less discriminatory and exclusionary because it reduces the number of denials, especially for Black (female) applicants who would be banned from Tricon properties.

113.   This framework is not only reasonable, but it is well-established as a less discriminatory alternative by HUD. Earlier this year, HUD's Office of Fair Housing and Equal Opportunity issued guidance recommending that housing providers conduct an individualized review of eviction records on tenant screening reports and correct or disregard inaccurate or incomplete records because "overbroad

screenings for eviction history may have an unjustified discriminatory effect" on Black renters, especially women and families.[23]

114.   In light of the unreliability of eviction data, and the probable disparate impact on Black, particularly Black female, renters, HUD's guidance stated that housing providers should not deny housing to applicants based on "eviction proceedings where the tenant prevailed, a settlement was reached, or the matter was dropped"; "'no fault' evictions"; or "[a]n eviction that occurred long ago or under circumstances that are no longer relevant."[24] HUD also stated that it would be "particularly problematic to hold a past eviction against a tenant" where that eviction was "filed . . . in retaliation for asserting their rights" or "due to an underlying experience of domestic violence, dating violence, sexual assault, or stalking."[25]

115.   HUD further noted that housing providers who do not conduct an individualized review of eviction records may be in violation of the Fair Housing Act.

116.   That is precisely the case with Tricon: Because the company automatically excludes any potential renter with an eviction *filing* within the past few years—regardless of whether the filing resulted in a completed eviction, whether

---

[23] HUD, *supra* n.18, at 20.
[24] *Id.*
[25] *Id.* at 20–21.

the filing was the fault of the tenant, whether the filing has been expunged, whether the renter's financial circumstances have changed, or other relevant mitigating information—Tricon violates the Fair Housing Act.

## CLASS ALLEGATIONS

117. Tricon relies on the same applicant screening policies across its nationwide portfolio of nearly 40,000 single-family homes. These policies harmed not just Mr. Williams, but also the many other applicants who also faced automatic rejection because of their justice involvement.

118. Mr. Williams accordingly brings this Complaint as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of himself and similarly situated individuals.

119. Mr. Williams requests that this Court certify a nationwide class of all Black applicants who were otherwise qualified to rent with Tricon but were automatically rejected from tenancy based on Tricon's criminal history policy on or after January 1, 2015 ("the Class").

120. Mr. Williams is a member of the Class he seeks to represent.

121. The Class asserts claims under the federal Fair Housing Act, 42 U.S.C. § 3604, and the Fair Employment and Housing Act, Cal. Gov't Code § 12955.

122. This action is properly maintained as a class action.

123.    The volume of Class members is sufficiently numerous that joinder of all members is impracticable. Tricon appears to have relied on the same criminal history policy since it began managing its single-family home portfolio around January 1, 2015. Throughout that time, the number of homes managed by Defendants has steadily increased and is now nearly 40,000. At the same time, the United States maintains a high rate of conviction and incarceration. Plaintiffs estimate that Tricon automatically rejected scores of applicants based on their justice involvement.

124.    Defendants have acted or refused to act on grounds generally applicable to the Class.

125.    There are questions of law or fact common to each Class member. Such questions include, without limitation: (a) whether Tricon's criminal history policy disproportionately excludes Black applicants; (b) whether such a disparate impact can be justified by business necessity; (c) whether there are available alternative screening policies that would have a less discriminatory impact; and (d) whether the Class members have sustained damages and the measure of those damages.

126.    Mr. Williams's claims are typical of those of the Class because: (a) he is a Black person; (b) he submitted a rental application to Tricon and was automatically rejected by Tricon based on its criminal history policy within the

relevant time period; and (c) he was otherwise qualified to rent the unit to which he applied.

127.   Mr. Williams and class counsel will fairly and adequately represent the interests of the Class.

128.   Mr. Williams has no interests that are antagonistic to the interests of the Class as a whole.

129.   Class counsel have extensive experience in civil rights, consumer, and class action litigation.

130.   The Class is certifiable under Federal Rule of Civil Procedure 23(b)(2) as to liability and injunctive relief, because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to the Class as a whole.

131.   The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case. Damages can be proven on a class-wide basis via generally applicable evidence.

132.   Alternatively, class-wide liability and punitive damages liability under the theories advanced in this action are properly certified under Federal Rule of Civil

Procedure 23(c)(4) for the Class because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## **INJURY TO PLAINTIFFS**

133.   As a result of Tricon's discriminatory policy, Mr. Williams and those similarly situated have suffered compensatory harm, including emotional distress, pain and suffering, the injury to dignity associated with being stereotyped, and other injuries attendant to racial discrimination.

134.   Tricon's categorical rejection of certain justice-involved applicants caused them emotional distress, pain, and suffering. For example, after Mr. Williams was rejected by Tricon, he was unhoused for approximately a month. The rejection and resultant complications in Mr. Williams's search for housing caused him the emotional distress, pain, and suffering that any person in this situation would necessarily experience.

135.   Tricon's categorical rejection of certain justice-involved applicants caused them to experience the harm and stigma inherent in discrimination. Being reduced to and dismissed offhand on account of a prior criminal record, without any opportunity to discuss individual character or circumstances, causes the type of dignitary harm that the Fair Housing Act was designed to prevent.

136. Furthermore, Tricon's unlawful conduct, policies, and practices have inflicted and continue to inflict concrete, particularized, and substantial injuries on Plaintiff FHCCI by impairing its mission and by impairing its ongoing programs and core activities.

137. FHCCI's mission is to facilitate open housing for all people. This mission includes ensuring the availability of affordable and accessible housing; promoting housing choice and homeownership; advocating for an inclusive housing market; working toward stable and equitable communities; and eradicating housing discrimination within Central Indiana, the State of Indiana, and nationally.

138. FHCCI currently engages in programs and activities in furtherance of its mission. For example, FHCCI provides housing counseling and referral services to individual housing consumers and housing providers. Through its counseling work, FHCCI connects people with resources to help them locate housing options; to stave off eviction, foreclosure, or instability; to identify or access available housing programs; and to combat or address conflicts or inequities with their housing providers and/or housing services.

139. FHCCI also engages in neighborhood stabilization and community investment through its "Inclusive Communities" program. This program has included investing in and repairing properties; helping home seekers obtain credit;

securing housing for families in need of urgent shelter; and preventing displacement of elderly and differently abled homeowners.

140. FHCCI also lobbies for laws that will advance the organization's mission of open and accessible housing. This advocacy includes drafting issue statements and op-eds to propose and/or endorse new laws; meeting with regulators and policymakers; and identifying existing legislation that creates barriers to housing.

141. FHCCI also conducts education and outreach. This programming includes authoring and releasing fact sheets and guidance; conducting trainings and information sessions; and organizing community events.

142. Tricon is one of the largest providers of single-family rental homes in the country, and it relies on exclusionary applicant screening policies and practices that automatically reject people based on justice involvement and eviction history. These policies and practices harm FHCCI in at least three ways.

143. Tricon's rental screening policies and practices impair FHCCI's ongoing counseling and referral services, one of its core activities. As part of its counseling program, FHCCI responds to inquiries from people with justice involvement by providing referrals and support in their search for housing. Because Tricon's policies automatically exclude applicants based on justice involvement, there is less housing available for people with criminal histories. This decrease in

housing availability impairs FHCCI's counseling and referral services. This impairment is especially harmful because FHCCI has seen a significant rise in the number of intakes from people with justice involvement. Already, the number of inquiries FHCCI has received from justice-involved individuals in 2024 is nearly three times the number of inquiries FHCCI received from this population in 2018. Also, as part of its counseling program, FHCCI responds to inquiries from people with eviction histories by providing guidance on how to retain or find housing. Because Tricon's policies automatically exclude applicants based on eviction filings there is less housing available for this population. This decrease in housing availability impairs FHCCI's counseling and referral services.

144. Tricon's rental screening policies and practices also impair FHCCI's mission of ensuring open and affordable housing for all. People with justice involvement have an acute need to find stable and affordable housing, which is often required by probation and/or parole terms, and which is essential to maintaining employment. FHCCI has seen an increase in outreach from justice-involved individuals who are unable to find housing because of their criminal histories. FHCCI also receives inquiries from people with eviction filings on their records who are similarly unable to locate housing because of their rental histories. Although there is a demand for housing, especially for people with criminal and/or eviction histories, Tricon's policies and practices restrict the available housing stock and

1   shrink the single-family rental market. Given the size of Tricon's rental portfolio,

2   the impact of Tricon's exclusionary practices is considerable.

3          145.  Tricon's eviction screening policies and practices also interfere with

4   FHCCI's eviction expungement advocacy, another core activity. FHCCI was part of

5   a coalition that lobbied the state legislature to enact a law that permits expungements

6   of certain evictions, and eviction expungement has since been codified in Indiana.

7   FHCCI now helps people determine whether they qualify for eviction expungement

8   and, if so, helps them navigate the expungement process. Tricon automatically

9   excludes applicants where an eviction filing appears on their screening report,

10  irrespective of whether that eviction was subsequently dismissed, sealed, or

11  expunged. This disregard for disposition and expungement essentially nullifies

12  FHCCI's lobbying efforts and the time that FHCCI devotes to helping people obtain

13  expungements.

14         146.  These injuries are not mere setbacks to the organization's abstract goals

15  but rather direct and tangible impediments to FHCCI's ability to achieve its mission

16  of facilitating open housing access for all people and to FHCCI's activities and

17  programs.

18         147.  FHCCI has suffered further damages because the injuries to its mission

19  and activities caused a consequent drain on the organization's resources. FHCCI was

20

compelled to investigate and counteract Tricon's discriminatory policies and practices, and it diverted scarce resources to do so.

148. FHCCI has a small staff and a limited budget. Yet because Tricon's policies present an ongoing impairment to FHCCI's mission, FHCCI diverted staff time and incurred expenses researching Tricon's portfolio and policies; collecting documents; designing and implementing investigative calls; and drafting, mailing, and reviewing surveys. This expenditure of resources was necessary to determine the scope and degree of Tricon's discrimination.

149. FHCCI also diverted staff time and resources to engage in outreach to the potentially affected residents within its service area to educate them regarding their fair housing rights in relation to the types of unlawful discrimination in which Tricon was engaging. These education efforts included drafting a criminal history fact sheet for housing consumers; attending summits and expos hosted by reentry organizations; meeting with reentry organizations to discuss the needs of their clients; and conducting workshops and presentations for justice-involved individuals. FHCCI also diverted resources to training local agencies regarding housing for people with justice involvement.

150. FHCCI also diverted staff time and resources toward counseling Mr. Williams and investigating his experience with Tricon.

151.  In carrying out activities, for which it had not budgeted time or money, to counteract the harm caused by Tricon, FHCCI was forced to divert significant staff time and funds away from other planned activities. This diversion delayed, diminished, and interfered with FHCCI's core operations.

152.  FHCCI's investigation into Tricon impaired the organization's ability to respond to inquiries from housing consumers and to provide timely counseling to clients.

153.  Because it diverted time and resources to investigating Tricon, FHCCI had to delay research and drafting for five different public reports addressing environmental justice, the state of fair housing, investor-purchased properties, land contracts, and manufactured housing. The delay of these reports impaired FHCCI's mission and programming. Public reports are essential to one of FHCCI's core activities, education and outreach, because they raise awareness; generate clients and referrals; and promote industry-specific strategies for increasing open access to housing. If FHCCI had not diverted time to investigating Tricon, it could have released its reports sooner, and thus seen swifter progress on those topics.

154.  The time FHCCI expended to investigate and counteract Tricon's unlawful conduct thus perceptibly impaired FHCCI's mission and activities and thereby compounded and exacerbated the direct injuries inflicted by Tricon's conduct.

1    155.  Tricon's reliance on discriminatory screening practices has also harmed

2   FHCCI's reputation. Because of Tricon's reliance on discriminatory screening

3   practices, FHCCI's ability to support housing choice for justice-involved individuals

4   has been diminished. This undermines FHCCI's role in the community—both with

5   reentry organizations specifically and with potential funders and donors more

6   generally—because FHCCI is not able to achieve its mission or serve those in need.

7    156.  Unless enjoined, Tricon will continue to engage in the unlawful conduct

8   described herein and FHCCI's injuries will increase because it will have to continue

9   diverting resources and curtailing its other activities to counteract Defendants'

10   conduct.

11                            **CAUSES OF ACTION**

12      **Count I – Violation of the Fair Housing Act (42 U.S.C. § 3604)**

13                         **Criminal History Policy**

14                      **(All Plaintiffs v. All Defendants)**

15    157.   Plaintiffs repeat and incorporate by reference all allegations set forth in

16   paragraphs 1 through 156 above.

17    158.  Tricon's  acts,  policies,  and  practices  have  an  adverse  and

18   disproportionate impact on Black individuals as compared to similarly situated white

19   people. This adverse and disproportionate impact is the direct result of Tricon's

20   ongoing blanket policy of automatically refusing housing to certain people with

criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

159.    Tricon's acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that:

a.  Tricon's acts, policies, and practices have made and continue to make housing unavailable because of race in violation of 42 U.S.C. § 3604(a); and

b.  Tricon's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race in violation of 42 U.S.C. § 3604(c).

**Count II – Violation of Fair Housing Act (42 U.S.C. § 3604)**

**Eviction Filings Policy**

**(Plaintiff FHCCI v. All Defendants)**

160.    Plaintiffs repeat and incorporate by reference all allegations set forth in paragraphs 1 through 156 above.

161.    Tricon's acts, policies, and practices have an adverse and disproportionate impact on Black individuals, particularly Black women, as

49

compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Tricon's ongoing blanket policy of automatically refusing housing to certain people with eviction filing records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

162.    Tricon's acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that:

a.  Tricon's acts, policies, and practices have made and continue to make housing unavailable because of race and/or gender, in violation of 42 U.S.C. § 3604(a); and

b.  Tricon's notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race, and/or gender, in violation of 42 U.S.C. § 3604(c).

## Count III – Violation of California Fair Employment and Housing Act

## (CAL. GOV'T CODE § 12955(a), (c), (k))

## Criminal History Policy

## (All Plaintiffs v. All Defendants)

163.    Plaintiffs repeat and incorporate by reference all allegations set forth in paragraphs 1 through 156 above.

164.    Tricon's acts, policies, and practices have an adverse and disproportionate impact on Black individuals as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Tricon's ongoing blanket policy of automatically refusing housing to certain people with criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

165.    California has a cognizable public policy interest in Plaintiffs' claims. Tricon's illegal policy discriminating against certain justice-involved renters was promulgated from its property management headquarters in Orange County, California.

166.    California's Civil Rights Department, which administers the Fair Employment and Housing Act, issues regulations that are presumptively valid and binding under state law. Those regulations make it unlawful to:

> Implement a "blanket ban" or categorical exclusion practice that takes adverse action against all individuals with a criminal record regardless of whether the criminal conviction is directly related to a demonstrable risk to the identified substantial, legitimate, nondiscriminatory interest or purpose. Examples of such prohibited practices include bans against all individuals with a criminal record, bans against all individuals with prior convictions, bans against all individuals with prior misdemeanors, and bans against all individuals with prior felonies.

Cal. Code Regs. Tit. 2 § 12269(a)(5).

167.    Civil Rights Department regulations also make it unlawful to "[s]eek, consider, use, or take an adverse action based on information about any criminal conviction that has been sealed, dismissed, vacated, expunged, voided, invalidated, pardoned, or otherwise rendered inoperative by judicial action or by statute." Cal. Code Regs. Tit. 2 § 12269(a)(3).

168.    Tricon's policies fly in the face of California law. Tricon automatically rejected Mr. Williams solely because of his criminal history and refused his efforts to appeal the denial. It most certainly did not engage in an individualized review.

169.    Furthermore, Tricon refused to disregard Mr. Williams's expunged convictions, in direct violation of Civil Rights Department regulations.

170.    Tricon's acts, policies, and practices constitute discrimination and violate the California Fair Employment and Housing Act, Cal. Gov't Code § 12955, and its implementing regulations, in that:

a.  Tricon's acts, policies, and practices discriminate against persons because of their race in violation of Cal. Gov't Code § 12955(a) and Cal. Code Regs. Tit. 2 §§ 12265, 12269;

b.  Tricon's acts, policies, and practices have expressed and/or continue to express a preference, limitation, and discrimination based on race in violation of Cal. Gov't Code § 12955(c) and Cal. Code Regs. Tit. 2 §§ 12265, 12268, 12269; and

c.  Tricon's acts, policies, and practices have made and continue to make housing unavailable because of race in violation of Cal. Gov't Code § 12955(k) and Cal. Code Regs. Tit. 2 §§ 12265, 12269.

**Count IV – Violation of California Fair Employment and Housing Act**

**(CAL. GOV'T CODE § 12955(a), (k))**

**Eviction Filings Policy**

**(Plaintiff FHCCI v. All Defendants)**

171.   Plaintiffs repeat and incorporate by reference all allegations set forth in paragraphs 1 through 156 above.

172.   Tricon's acts, policies, and practices have an adverse and disproportionate impact on Black individuals, particularly Black women, as compared to similarly situated white people. This adverse and disproportionate impact is the direct result of Tricon's ongoing blanket policy of automatically refusing housing to certain people with eviction filing records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice—providing individualized consideration—that would have a less discriminatory effect.

173.   California has a cognizable public policy interest in Plaintiffs' claims. Tricon's illegal policy discriminating against renters with prior eviction filings was promulgated from its property management headquarters in Orange County, California.

174.  Tricon's acts, policies, and practices constitute discrimination and violate the California Fair Employment and Housing Act, Cal. Gov't Code § 12955, and its implementing regulations, in that:

a.  Tricon's acts, policies, and practices discriminate against persons because of their race and/or gender, in violation of Cal. Gov't Code § 12955(a);

b.  Tricon's acts, policies, and practices have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or gender, in violation of Cal. Gov't Code § 12955(c); and

c.  Tricon's acts, policies, and practices have made and continue to make housing unavailable because of race and/or gender, in violation of Cal. Gov't Code § 12955(k).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

(1)  Certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(2)  Enter a declaratory judgment finding that the foregoing actions of Tricon violate the Fair Housing Act and the California Fair Employment and Housing Act;

(3)    Enter an injunction enjoining Tricon and its directors, officers, agents, and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing Tricon and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effect of the illegal discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(4)    Award compensatory damages to Plaintiffs in an amount determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Tricon alleged herein;

(5)    Award punitive damages to Plaintiffs in an amount determined by the jury that would punish Tricon for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(6)    Award Plaintiffs their reasonably attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2) and California Code of Civil Procedure section 1021.5;

(7)    Award prejudgment interest to Plaintiffs; and

(8)    Order such other relief as this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

1    DATE: November 20, 2024

Respectfully submitted,
/s/ Ellora Thadaney Israni
Ellora Thadaney Israni (SBN 331877)
eisrani@relmanlaw.com
Valerie D. Comenencia Ortiz (SBN 322379)
vcomenenciaortiz@relmanlaw.com
Lila Miller (SBN 310614)
lmiller@relmanlaw.com
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
Telephone:   (202) 728-1888
Facsimile:    (202) 728-0848